AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Hawaii

| |
|---|
| FILED IN THE<br>UNITED STATES DISTRICT COURT<br>DISTRICT OF HAWAII<br>**Dec 06, 2023**<br>Lucy H. Carrillo, Clerk of Court |

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A 2008 GRAY CADILLAC ESCALADE WITH LICENSE PLATE SPC 240

)
)
)
)
)

Case No. Mag. No. 23-01705 RT

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A-1", incorporated by reference herein.

located in the _____ District of _____ Hawaii _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B", incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 and 846 | Possession with intent to distribute a controlled substance; Conspiracy |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph Hanawahine, Task Force Officer, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means).*

Date: December 6, 2023

City and state: Honolulu, Hawaii

_____
Rom A. Trader
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A 2008 GRAY CADILLAC ESCALADE WITH LICENSE PLATE SPC 240 | Mag. No. 23-01705 RT |
| IN THE MATTER OF THE SEARCH OF ONE BLACK APPLE IPHONE | Mag. No. 23-01706 RT |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

Joseph HANAWAHINE, Task Force Officer with Homeland Security

Investigations (HSI) Honolulu after being duly sworn, deposes and states as

follows:

## INTRODUCTION

1.     I make this affidavit in support of applications under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the following

PROPERTY:

- a 2008 gray Cadillac Escalade, Hawaii license plate SPC 240, the vehicle of Rusty Shane Ikaika NAPARAN, further described in Attachment A-1, hereafter referred to as the "TARGET VEHICLE";

- one black Apple iPhone, hereafter the "TARGET CELLPHONE", as described in Attachment A-2;

(hereafter collectively referred to as the "TARGET PROPERTY"), and seize the items described in Attachment A-1 and A-2, all of which constitute or contain evidence, fruits, or instrumentalities of crimes relating to the possession and/or distribution of controlled substances, conspiracy to do the foregoing, and aiding and abetting these offenses, all in violation of Title 21, United States Code, Sections 841 and 846.

## TRAINING AND EXPERIENCE

2.    I am a Task Force Officer ("TFO") with the Department of Homeland Security and Investigations ("HSI") and currently assigned to HSI Boarder Enforcement Security Taskforce ("BEST") Honolulu Office. I am currently a Detective with the Honolulu Police Department ("HPD") assigned to the Intelligence Enforcement Division. As a HSI Task Force Officer, one of my duties and responsibilities includes but is not limited to the investigation of possible criminal violations of narcotics trafficking (Title 21, United States Code, Section 841 et. seq.) and the Money Laundering Control Act (Title 18, United States Code, Section 1956 et. seq.).  Prior to my current assignment I was assigned to the HPD District 8 Burglary/Theft Detail, HPD Criminal Investigations Division ("CID"), HPD Narcotics-Vice Division and HPD Uniform Patrol. As a member of HPD and current Task Force Officer, I have conducted and assisted in more than two hundred (200) investigations involving narcotics trafficking and financial crimes

2

specified above.

3.      I have become knowledgeable with the enforcement of laws
pertaining to narcotics and dangerous drugs. I attended and successfully
completed narcotic training program put on by the Drug Enforcement Agency
("DEA"). I have participated in investigations of offenses enumerated in Title 18,
United States Code, Section 2516, including (a) the importation, distribution and
possession with intent to distribute controlled substances, (b) the use of
communications facilities to facilitate the same, (c) money laundering,
(d) conspiracy to do the foregoing, and (e) aiding and abetting these offenses, all in
violation of Title 21, United States Code, Sections 841, 843, and 846. During my
time with the Narcotic Vice Division I have participated in numerous
investigations where I have (a) assisted with both physical and wire surveillance;
(b) executed search warrants; (c) reviewed and analyzed numerous recorded
conversations and documents of drug traffickers and money launderers;
(d) debriefed cooperating drug traffickers and money launderers; (e) conducted
surveillance of individuals engaged in drug trafficking, money laundering, and
other violations of federal and state law.  Through my training, education, and
experience, I have become familiar with (a) the manner in which illegal drugs are
imported and distributed; (b) the method of payment for such drugs and the
movement and concealment of proceeds from the sale of controlled substances;

3

and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4.     As a result of my training and experience, I am familiar with how various drugs are used and the typical distribution and trafficking methods used by drug dealers and traffickers. In addition, I am also familiar with the typical methods used by traffickers to "courier" and clandestinely transport controlled substances and proceeds from the sale of controlled substances through airports and by common carriers such as FedEx, UPS, the U.S. Mail, small parcel carriers, and freight services.

5.     As a result of my training and experience, I am aware that drug traffickers maintain evidence, fruits, and instrumentalities of their drug-related crimes in their personal residences, vehicles, rental storage units, safe deposit boxes at banks and other businesses, other dwellings and buildings located away from sites formally associated with traffickers (referred to as "stash houses"), and at businesses drug traffickers use to launder drug proceeds and facilitate and conceal their drug trafficking. In a substantial number of residential, vehicular, storage unit, safe deposit box, stash house, and business searches executed in connection with the drug and money laundering investigations in which I and other narcotics investigators have been involved, the following kinds of evidence of the crimes identified above have typically been recovered: (1) Controlled substances,

4

to include methamphetamine, heroin, cocaine, marijuana and fentanyl, held in violation of 21 U.S.C. §§ 841(a)(1) and 844; (2) Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, for example: scales, funnels, sifters, grinders, plastic bags, and the like; (3) Books, records, receipts, notes, ledgers, other papers relating to the distribution of controlled substances, including but not limited to electronically recorded information maintained on personal computers, telephone answering/recording machines and telephone and beeper/pager equipment, records and data maintained electronically on digital devices, including personal computers, laptop computers, electronic tablets, and cellular telephones, and on digital storage media, including hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media; (4) Personal books, papers, and electronically stored information reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances; (5) Cash, currency, and records, including electronically stored information, relating to controlled substances income and expenditures of money and wealth, to include money orders, wire transfers, cashier's checks, and receipts, bank statements, passbooks, checkbooks, and check registers, tax returns, financial applications, as well as precious metals and gems such as gold, silver, diamonds, etc.; (6) Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and itineraries,

5

airline schedules, bills, charge card receipts, hotel/motel/rental car statements,

airline/rental car/hotel frequent flier/user cards and statements, passports and other

papers relating to domestic/international travel; (7) Waybills, air bills, bills of

lading, receipts, delivery notices, other shipping documentation and packaging

materials from the U.S. Postal Service, Federal Express, UPS, small package

carriers, or common carriers which indicate the shipment of packages and parcels

to and from Hawaii; (8) Firearms, ammunition, and other dangerous weapons;

(9) Cellular telephones and (10) Personal books and papers reflecting names,

addresses, telephone numbers and other contact/identification data to the purchase

and distributions of controlled substances.

6.      In addition, during the course of said residential, vehicular, storage

unit, safe deposit box, stash house, and business searches, I and other agents have

also found items of personal property that tend to identify the person(s) in

residence, occupancy, control or ownership of the subject property.  Such

identification evidence is typical of the articles people commonly maintain in their

residences, such as canceled mail, deeds, leases, rental agreements, photographs,

photographs, letters, personal telephone books, diaries, utility and telephone bills,

statements, identification documents, and keys.

7.      Based upon my experience and training, as well as the corporate

knowledge and experience of other agents and officers with whom I work, I am

6

aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences, vehicles, storage lockers, safe deposit boxes, stash houses, and businesses. Furthermore, it is generally a common practice for drug traffickers to maintain in their residences, vehicles, storage lockers, safe deposit boxes, stash houses, and businesses records of evidentiary value relating to their drug trafficking activities for months or years at a time. Because drug traffickers in many instances will "front" (i.e. sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record keeping, and/or ledgers, are necessary to keep track of amounts paid and/or owed and such records will also be maintained close at hand so as to readily ascertain current balances. Such record keeping, and/or ledgers, are also maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to drug traffickers and such records are rarely discarded. Additionally, telephone/address listings of clients and suppliers necessarily must be maintained and be immediately available in order to efficiently conduct their drug trafficking business.

8. It is also a generally common practice for traffickers to conceal in their residences, vehicles, storage lockers, safes, safe deposit boxes, stash houses, and businesses large sums of money, either the proceeds from drug sales or to be

7

utilized to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences, vehicles, storage lockers, safes, safe deposit boxes, stash houses, and businesses.

9.     Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

10.    In a number of residential and vehicle searches in prior drug trafficking investigations, these enumerated types of evidence have typically been recovered from the main residence, vehicles, and in addition, from other structures and areas on the property being searched, for example, other buildings, outbuildings, garages, yard areas, trash containers, storage areas, and other containers and vehicles used in connection with or within the curtilage of said property and buildings.

11.    Drug traffickers commonly use telecommunication devices to further their illegal operations, including telephones and cellular telephones. Traffickers commonly receive telephone calls, voicemails, and text messages from individuals seeking to conduct drug transactions. These messages, as well as numbers for their

8

associates in the drug trafficking organization ("DTO") or other individuals involved in trafficking activity, are often stored in traffickers' cellular telephones. Cellular telephones typically have electronic memory capability within which information can be stored. Content from cellular telephones (such as text messages and photos) can often be backed up or saved on personal computers or other electronic devices. Drug traffickers commonly use coded language to refer to drug operations, use multiple phones at one time, and change phone numbers frequently to avoid detection by law enforcement.

12.     I know that drugs such as methamphetamine, heroin, and cocaine are generally brought into the District of Hawaii in bulk, high purity form. Equipment, such as scales, sifters, grinders, razor blades, glass panes, and mirrors, and the like are typically used in processing and packaging the drugs into smaller quantities for distribution.

13.     Drugs such as methamphetamine, heroin, and cocaine are not manufactured or cultivated to any significant extent within the District of Hawaii. "Source countries" for the manufacture and cultivation of methamphetamine, heroin, and cocaine include Central and South America (for instance, Bolivia, Peru, Columbia, Guatemala, and Mexico, among others). Further, Mexico is a known methamphetamine, heroin, and cocaine distribution point for much of the western United States, including California, Hawaii, Washington, and Oregon.

9

Consequently, traffickers in these drugs must themselves travel (or pay and arrange for others to travel on their behalf) to or from Hawaii, California, Washington, and Oregon to acquire and import the drugs. Such travel necessarily results in the generation of various travel documents for the traveler, which typically are also kept in residences.

14. This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth facts that I believe establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 are presently located at the TARGET PROPERTY.

## **PROBABLE CAUSE**

15. In February through May 2022, a HPD undercover officer (hereinafter "HPD UC") purchased marijuana from NAPARAN on multiple occasions. In May 2022, the HPD UC made contact with NAPARAN his residence to purchase marijuana. During this transaction, the UC inquired about other "party favors" and NAPARAN informed the HPD UC that he also does "soft" (street vernacular for "cocaine"). The HPD UC inquired about purchasing a "ball" (street vernacular for "1/8th oz. or 3.5 grams") but NAPARAN related that he did not have that much on him at the time but could get it. NAPARAN further explained to the HPD UC that he normally picked up 2 "zips" (a zip is street vernacular for "ounce") but he did

10

not have a "ball" with him at that moment, but could get it and that he

(NAPARAN) would contact the HPD UC when he had it in hand.  Shortly

thereafter, the HPD UC was notified by NAPARAN that he was successful in

getting the "ball" of "soft" for the HPD UC. The HPD UC went NAPARAN's

residence and purchased the "ball" of "cocaine", 3.5285 grams, from NAPARAN

for the negotiated price of $270.00. The evidence was tested by HPD SIS and

tested positive for cocaine.

16.     In June 2022, the HPD UC made contact with NAPARAN at his

residence.  During this transaction, the HPD UC picked up 3.5359 grams of

cocaine from NAPARAN for the negotiated price of $260.00.

17.     Later in June 2022, the HPD UC met with NAPARAN and introduced

a HSI undercover task force officer (hereinafter the "TFO UC"). Prior to the meet,

NAPARAN was observed driving the TARGET VEHICLE from his residence to

the pre-determined meet. The TFO UC conversed with NAPARAN and discussed

coordinating future cocaine purchases with NAPARAN. NAPARAN agreed and

all three parties ended up eventually departing and going their respective ways.

18.     In July 2022, the TFO UC made contact with NAPARAN and

informed NAPARAN that he wanted to purchase one ounce (1 oz.) of cocaine

form NAPARAN. During this time, investigators observed NAPARAN driving the

TARGET VEHICLE from his residence to meet the TFO UC. During this meet,

11

the TFO UC entered the TARGET VEHICLE with NAPARAN. The TFO UC was presented the purported cocaine from NAPARAN and the TFO UC weighed it and informed NAPARAN that it was short, meaning that it was less than an ounce (1 oz.). NAPARAN informed the TFO UC that he could get the remaining cocaine to make the weight of 1 ounce (1 oz.). The TFO UC then informed NAPARAN that he wanted purchase an additional ounce of cocaine. NAPARAN agreed and later contacted the TFO UC that he had the additional ounce of cocaine and the rest of the cocaine to complete the first initial ounce order of cocaine. The TFO UC subsequently met up with NAPARAN again and conducted the deal in the TARGET VEHICLE and purchased a total of two ounces (2 oz.) of cocaine for the negotiated price of $3,600. Upon conclusion of the narcotic purchase, NAPARAN left the area in the TARGET VEHICLE. The narcotic evidence in this purchase was field-tested positive for cocaine.

19.     In July 2022, the TFO UC contacted NAPARAN to purchase additional cocaine from him. NAPARAN drove the TARGET VEHICLE and met TFO UC at a pre-determined location. TFO UC entered the TARGET VEHICLE with NAPARAN and completed a two ounce (2 oz.) purchase of cocaine with NAPARAN. The cocaine that was purchased from NAPARAN was field tested positive for cocaine.

12

20.    In the month of August 2022, TFO UC met with NAPARAN to conduct another cocaine transaction. NAPARAN was observed driving the TARGET VEHICLE to meet with the TFO UC. The TFO UC purchased two ounces (2 oz.) of cocaine from NAPARAN. During this time, the TFO UC informed NAPARAN that he/she needed an additional two ounces (2 oz.) of cocaine. At that time, the TFO UC observed NAPARAN make a phone call to another person to request the additional two ounces (2 oz.) After the phone call, NAPARAN informed the TFO UC that he had to pick up the additional cocaine. During this time NAPARAN left the area in the TARGET VEHICLE and proceeded to his residence. Surveillance observed NAPARAN exit his residence and return to the TARGET VEHICLE, and then drive back to meet with the TFO UC and completed the second two-ounce (2 oz.) cocaine deal. The four ounces (4 oz.) of cocaine field tested positive for cocaine.

21.    In the month of September 2022, the TFO UC contacted NAPARAN to purchase 2 ounces (2 oz.) of cocaine. NAPARAN informed the TFO UC that he only had one ounce (1 oz.) and had to wait for his "uncle" to wake up to get the additional ounce. NAPARAN was then observed exiting his residence and entering the TARGET VEHICLE. He drove to meet the TFO UC and sold the TFO UC two ounce of cocaine. The 2 oz. of cocaine that the TFO UC purchased from NAPARAN was field tested positive for cocaine.

22.    In the month of November 2022, the TFO UC contacted NAPARAN to purchase a half kilo of cocaine and was informed that it would cost Twenty Thousand Five Hundred Dollars ($20,500). The TFO UC met with NAPARAN and was informed that the cocaine came from a friend of his who he referred to as "Bryce". While conducting the deal NAPARAN informed TFO UC that he has to meet with his friend that he got the cocaine from to pay off the remaining monies he owes his friend for the cocaine. NAPARAN completed the narcotic deal with the TFO UC and then departed.

23.    Prior to the month of November 2023, TFO UC introduced a HSI Special Agent undercover agent ("UCA") to NAPARAN. NAPARAN met with UCA to further discuss future narcotic purchases of cocaine. The UCA informed NAPARAN that he/she had access to getting cocaine at a cheaper price than the Hawaii prices. NAPARAN informed the UCA that he wanted to be fronted some cocaine and that he would then in turn give the UCA the money that was owed to the UCA after he (NAPARAN) sells the cocaine.

24.    On November 29, 2023, the UCA contacted NAPARAN via phone and informed NAPARAN that he/she was in town and had the cocaine that he (NAPARAN) requested. The UCA asked if he had any money for the cocaine or still needed to be fronted the cocaine. NAPARAN informed the UCA that he did not have cash at the time. The UCA then requested two zips (street vernacular for

14

"2 oz.") of green (street vernacular for "marijuana") from NAPARAN. The UCA

informed NAPARAN that he/she would deduct the cost of the green from the price

that NAPARAN owed the UCA for the cocaine. Surveillance was conducted and

NAPARAN was observed leaving his residence in the TARGET VEHICLE and

eventually met up with the UCA at a pre-determined location. NAPARAN met

with the UCA and the UCA gave NAPARAN the cocaine and in turn NAPARAN

gave the UCA two zips (2 oz.) of green vegetable matter resembling that of

marijuana. The UCA informed NAPARAN that he/she would take it off the

balance that NAPARAN owed the UCA for the cocaine. Shortly thereafter HSI

special agents moved in and arrested NAPARAN without incident. The TARGET

CELLPHONE was seized from NAPARAN's person.

25.     An HPD narcotic canine dog, "Mervin", and his canine handler,

Corporal Jaret Fernandez (Corporal Fernandez), were called to the scene to

examine the TARGET VEHICLE. Corporal Fernandez ran his dog on the

TARGET VEHICLE and related to the HSI agents present and your affiant that

"Mervin" had a change of behavior thereby indicating a positive alert for the

"odor" of narcotic emitted from the TARGET VEHICLE. The TARGET

VEHICLE was then towed locked and secured to the offices of the Homeland

Security Investigations in Honolulu Hawaii. Corporal Fernandez and "Mervin's"

credentials as a narcotics canine are set forth in Attachment C, incorporated by reference herein.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## **TECHNICAL TERMS**

26.      Based on my training and experience, I use the following technical

terms to convey the following meanings:

a.      IP Address:  The Internet Protocol address (or simply "IP

address") is a unique numeric address used by computers on the Internet.

An IP address looks like a series of four numbers, each in the range 0-255,

separated by periods (e.g., 121.56.97.178).  Every computer attached to the

Internet must be assigned an IP address so that Internet traffic sent from and

directed to that computer may be directed properly from its source to its

destination.  Most Internet service providers control a range of IP addresses.

Some computers have static—that is, long-term—IP addresses, while other

computers have dynamic—that is, frequently changed—IP addresses.

b.      Internet:  The Internet is a global network of computers and

other electronic devices that communicate with each other.  Due to the

structure of the Internet, connections between devices on the Internet often

cross state and international borders, even when the devices communicating

with each other are in the same state.

c.      Storage Medium:  A storage medium is any physical object

upon which computer data can be recorded.  Examples include hard disks,

RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

27.     As described above and in Attachment A-2, this application seeks permission to search for records that might be found on the TARGET PROPERTY, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

28.     *Probable cause.* I submit that if a computer or storage medium is found on the TARGET PROPERTY, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

        a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.

18

This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.      Apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

   d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

19

29.     *Forensic evidence.* As further described in Attachment B, this
application seeks permission to locate not only computer files that might serve as
direct evidence of the crimes described on the warrant, but also for forensic
electronic evidence that establishes how computers were used, the purpose of their
use, who used them, and when. There is probable cause to believe that this
forensic electronic evidence will be on any storage medium in the TARGET
PROPERTY because:

    a.     Data on the storage medium can provide evidence of a file that
was once on the storage medium but has since been deleted or edited, or of a
deleted portion of a file (such as a paragraph that has been deleted from a
word processing file). Virtual memory paging systems can leave traces of
information on the storage medium that show what tasks and processes were
recently active. Web browsers, e-mail programs, and chat programs store
configuration information on the storage medium that can reveal information
such as online nicknames and passwords. Operating systems can record
additional information, such as the attachment of peripherals, the attachment
of USB flash storage devices or other external storage media, and the times
the computer was in use. Computer file systems can record information
about the dates files were created and the sequence in which they were
created, although this information can later be falsified.

20

b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses

21

through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence

on the computer or password protecting/encrypting such evidence in an
effort to conceal it from law enforcement).

    c.      A person with appropriate familiarity with how a computer
works can, after examining this forensic evidence in its proper context, draw
conclusions about how computers were used, the purpose of their use, who
used them, and when.

    d.      The process of identifying the exact files, blocks, registry
entries, logs, or other forms of forensic evidence on a storage medium that
are necessary to draw an accurate conclusion is a dynamic process. While it
is possible to specify in advance the records to be sought, computer evidence
is not always data that can be merely reviewed by a review team and passed
along to investigators. Whether data stored on a computer is evidence may
depend on other information stored on the computer and the application of
knowledge about how a computer behaves. Therefore, contextual
information necessary to understand other evidence also falls within the
scope of the warrant.

    e.      Further, in finding evidence of how a computer was used, the
purpose of its use, who used it, and when, sometimes it is necessary to
establish that a particular thing is not present on a storage medium. For
example, the presence or absence of counter-forensic programs or anti-virus

23

programs (and associated data) may be relevant to establishing the user's intent.

30.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a device for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the device, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

        a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on the device could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.

24

Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

     b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the device. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

31.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require

techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

32. Because several people may share the TARGET PROPERTY, it is possible that the TARGET PROPERTY will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

//

//

//

//

//

//

//

//

//

//

//

26

## CONCLUSION

33.    Based upon all of the foregoing, there is probable cause to believe that

the TARGET PROPERTY described in Attachment A-1 and A-2 contains the

fruits, instrumentalities, and evidence of the possession and/or distribution of

controlled substances, money laundering, conspiracy to do the foregoing, and

aiding and abetting these offenses, all in violation of Title 21, United States Code,

Sections 841 and 846. Accordingly, there is probable cause for a warrant to search

the TARGET PROPERTY described in Attachment A-1 and A-2 and seize the

items described in Attachment B.

DATED:  December 5, 2023, at Honolulu, Hawaii.

Respectfully submitted,

Joseph Hanawahine
Task Force Officer
Homeland Security Investigations

Sworn to under oath before me telephonically and attestation acknowledged
pursuant to Fed. R. Crim. P. 4.1(b)(2), this 6th day of December, 2023.

Rom A. Trader
United States Magistrate Judge

27

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is a 2008 grey/blue Cadillac Escalade bearing Hawaii license plate SPC 240 and the vehicle identification number is 1GYFK63898R250587. The TARGET VEHICLE is currently secured at the offices of the Homeland Security Investigations in Honolulu, Hawaii.



## **ATTACHMENT B**

**LIST OF ITEMS AUTHORIZED TO BE SEARCHED FOR AND SEIZED**

**Evidence concerning violations of 21 U.S.C. §§ 841 and 846, in whatever form,**

**including but not limited to the following items:**

1.  Controlled substances, including but not limited to, cocaine and marijuana held in violation of 21 U.S.C. §§ 841(a)(1) and 846.

2.  Paraphernalia for using, packaging, processing, weighing, and distributing controlled substances, to wit: scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, heat-sealing devices, pipes, butane torches, lighters, and the like.

3.  Books, records, receipts, notes, ledgers and other papers relating to the distribution of controlled substances.

4.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact/identification data relating to the distribution of controlled substances.

5.  Cash, currency, and records relating to income and expenditures of money and wealth from controlled substances, to wit, money order, wire transfer and cashier's check receipts, and bank statements, passbooks, checkbooks, and check registers.

6.  Airline tickets, notes and itineraries, airline schedules, bills, charge card receipts, hotel/motel/rent-a-car statements, correspondence with travel agencies and other travel-related businesses, airline/rent-a-car/hotel frequent flier/user cards and statements, passports and other papers relating to domestic/international travel.

7.  Waybills, airbills, bills of lading, receipts, delivery notices, and other shipping documentation from the U.S. Postal Service, small package carriers, or common carriers which indicate the shipment of packages and parcels to and from Hawaii.

8.  Firearms and ammunition in violation of 18 U.S.C. § 922(g).

9.  Firearm's parts, pieces, tools and equipment used to manufacture and assemble the firearms due to the presence of "ghost" firearms, as we as records relating to any such parts or equipment, including without limitation, purchase orders, sales receipts, or communications related to the purchase or sale of such items.

10. Computers, electronic organizers, pagers, cellular telephones, telephones and telephone answering machines, and other communication devices and storage media which could evidence distribution of controlled substances or participation in a conspiracy to distribute and possess with intent to distribute controlled substances

11. Cellular telephone, and the contents of such including messages, photos, contacts, and contents of encrypted communication applications.

12. For any computer or storage medium, including cellular telephones, whose seizure is otherwise authorized by this warrant (hereinafter, "DIGITAL DEVICE"):
    a.  evidence of who used, owned, or controlled the DIGITAL DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;
    b.  evidence of software that would allow others to control the DIGITAL DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;
    c.  evidence of the lack of such malicious software;
    d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;
    e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;
    f.  evidence of the attachment to the DIGITAL DEVICE of other storage devices or similar containers for electronic evidence;
    g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DIGITAL DEVICE;

h.   evidence of the times the DIGITAL DEVICE was used;

i.   passwords, encryption keys, and other access devices that may be necessary to access the DIGITAL DEVICE, programs, applications, or websites;

j.   documentation and manuals that may be necessary to access the DIGITAL DEVICE or to conduct a forensic examination of the DIGITAL DEVICE;

k.   records of or information about Internet Protocol addresses used by the DIGITAL DEVICE;

l.   records of or information about the DIGITAL DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment; and

n.   any evidence as described in paragraph 1 above.


THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF THE CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIMES.

ATTACHMENT: C

CERTIFICATION OF HANDLER AND CANINE "MERVIN"
NARCOTICS DETECTION CERTIFICATION NUMBER J-M/1-23

Jaret FERNANDEZ, a Corporal with the Honolulu Police
Department ("HPD"), is currently the trainer/handler of
"Mervin", a narcotics detector canine.  Corporal FERNANDEZ
has received special training to be a narcotics detector
dog handler from the HPD Training Division, Specialized
Services Division, and Narcotics/Vice Division. Corporal
FERNANDEZ has also received special training from the Vohne
Liche Kennels, the California Narcotic Canine Association
(CNCA), the American Working Dog (AWD), and the Hawaii
Narcotics Canine Training Seminars.

Corporal FERNANDEZ and K9 "Mervin" became a Narcotics
Canine Team since November 2017. Corporal FERNANDEZ is the
second handler K9 "Mervin" has been assigned to. This re-
assignment was a due to the retirement of K9 "Mervin's"
previous handler (Corporal Jeff MERTENS).

K9 "Mervin" was certified in narcotics detection with
Corporal Jaret FERNANDEZ in 2018.

"Mervin" has been trained to recognize the distinctive
odors of controlled substances such as heroin, cocaine,
methamphetamine, marijuana (as well as their derivatives),
and to then alert his handler when he has detected such
odors.  "Mervin" can alert to these odors emanating from,
but not limited to: (1) various containers such as baggage,
parcels, mail, and cargo; (2) various locations in motor
vehicles, boats, dwellings, businesses, offices, and other
areas; and (3) currency, notes, and other documents.

In March 2023, "Mervin" was certified to recognize the
distinctive odor of fentanyl. "Mervin was certified by
certifying official Charles Frank LACADEN, of the
California Narcotics Canine Association (CNCA).

A Honolulu Police Department (HPD) K9 Trainer conducts
annual departmental certification for its narcotics
detector dogs. This certification is to assure the K9
team's ability to detect controlled substances.

1

Corporal FERNANDEZ and K9 Mervin are tested on rooms, vehicles, parcels, luggage, open area, warehouse, and lockers. Honolulu Police Department's K9 Trainer Pete JONES certified the team of Corporal FERNANDEZ and K9 "Mervin" in April of 2022.
The Honolulu Police Department has a written curriculum for its canine assessments which are stringent and realistic and is geared towards everyday canine duties.

In addition to HPD certification, certifying official Charles Frank LACADEN Jr. of the American Working Dog (AWD), initially certified Corporal FERNANDEZ and K9 "Mervin" as a team in January of 2018 and then recertified the team in March of 2019, March of 2020, March 2021, March 2022, and again in March 2023.

LACADEN conducts a certification test format for the AWD, which is separate from the test format which is used for (CNCA). Corporal FERNANDEZ and K9 Mervin have passed the certification standards set forth by the AWD. In this certification test format, Corporal FERNANDEZ and K9 Mervin are tested on rooms, and vehicles, which meet certification standards.

Corporal FERNANDEZ and K9 Mervin have also passed the certification standards set forth by the California Narcotics Canine Association (CNCA). In this certification test format, Corporal FERNANDEZ and K9 Mervin are tested on rooms and vehicles, which meets certification standards.

Certifying official Charles Frank LACADEN Jr. of the California Narcotics Canine Association (CNCA), initially certified Corporal FERNANDEZ and "Mervin" as a team in March of 2018 and then recertified the team in March of 2019, March 2020, March 2021, March 2022, and again in March 2023.

In addition to annual certification, "Mervin" regularly receives periodic maintenance training from his handler and/or trainers.  During maintenance training and annual certification, real controlled substances are utilized as training aids. The training aids are hidden in various quantities, heights and depths. During training, distractions are used to include but not limited to food, coffee, plastic, carbon paper, candles, animals, liquids, machinery, etc.

2

Training venues are conducted on but not limited to (1) various containers such as baggage, parcels, mail, and cargo; (2) various locations in motor vehicles, boats, dwellings, businesses, offices, and other areas; and (3) currency, notes, and other documents.

As part of his training; Corporal FERNANDEZ has attended the 5th Annual International Police K-9 Conference and Vendor Show. This event was held from March 05th 2019 to March 07th 2019 in Las Vegas, Nevada.

Corporal FERNANDEZ has also attended the 29th Annual CNCA (California Narcotic Canine Association) Training Institute Conference. This event was held from January 13th 2020 to January 15th 2020 in Palm Springs, California.

Corporal FERNANDEZ has also attended the United States Department of Justice, Drug Enforcement Administration JETWAY Interdiction course. This course was held from February 07th 2023 to February 09th 2023 at the Honolulu Police Department's Training Academy in Waipahu, Hawaii.

Since November 2017, "Mervin" has received at least 1140 hours of training as a narcotics detector canine, during which time he has successfully detected at least 1221 training aids.

In addition, during operational deployments "Mervin's" alerts have led to the seizures of marijuana, heroin, cocaine, and methamphetamine (as well as their derivatives).

Also, during deployments, Mervin has alerted to boxes and vehicles where no measurable amount of controlled substances was recovered. Based on my training and experience, these "non-productive" alerts may have been caused when a non-measurable quantity of illicit narcotics odor contaminated these items.

Corporal FERNANDEZ has been an HPD canine handler from November 2017 to the present.

Corporal FERNANDEZ has completed a 120 hour Single Purpose Narcotic Detector Dog Handlers Course from November 06 to November 22, 2017 from Vohne Liche Kennels and the Indiana Law Enforcement Training Academy.

3

Canine "Mervin" is the first canine that Corporal FERNANDEZ
has handled. The K9 team of Corporal FERNANDEZ and K9
Mervin has passed certification standards in a controlled
environment in which K9 Mervin is able to recognize and
alert to the odor of the narcotic. Also, Corporal FERNANDEZ
being a K9 handler, can recognize the canine's alert to the
odor of narcotic.

Based upon his experience and training, Corporal FERNANDEZ
believes that "Mervin" is a reliable narcotics detector
dog.




Jaret FERNANDEZ          #004760
Narcotics/Vice Division
Honolulu Police Department

DATE:   11-29-2023

4